Filed 2/14/14  In re Luke C. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re LUKE C., a Person Coming Under the Juvenile Court Law. | B248828 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>MICHAEL C.,<br><br>        Defendant and Appellant,<br><br>LUKE C.,<br><br>        Objector and Appellant. | (Los Angeles County Super. Ct. No. CK81043) |

APPEAL from orders of the Los Angeles County Superior Court. Debra Losnick, Commissioner.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Appellant Luke C.

Valerie N. Lankford, under appointment by the Court of Appeal, for Appellant Michael C.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Respondent.

The dependency court entered orders terminating its jurisdiction over a minor child, with a family law order granting his mother sole legal and physical custody, and granting his father monitored visits in a therapeutic setting. Father and minor filed appeals. We affirm the dependency court's orders.

**FACTS**

Yolanda C. (mother) and Michael C. (father) married in 2006 and separated in 2009. Mother and father are the parents of two children: Joseph C. (born in 2002) and Luke C. (born in 2008). Only Luke is involved in the present appeal. In 2010, mother filed a petition for dissolution of marriage and for child custody and child support orders. At about the same time, mother obtained a domestic violence prevention restraining order against father; the order granted father supervised visitation rights with the children. The dependency proceedings which gave rise to the present appeal commenced shortly after the divorce and child custody case began in the family law court. At that time, Joseph and Luke lived with mother.

In April 2010, the Los Angeles County Department of Children and Family Services (DCFS) received information that generated a "five-day referral" by the case social worker (CSW).[1] During ensuing interviews, Mother reported a history of domestic violence by father throughout the parents' relationship; father denied mother's claim of domestic violence and reported that mother was the violent one. In May 2010, DCFS held separate team decision meetings with mother and father. As a result of the meetings, DCFS took the children into protective custody on grounds of general neglect and child endangerment due to domestic violence. On May 18, 2010, DCFS filed a juvenile dependency petition on the children's behalf.

---

[1]     As we understand DCFS's procedures, a referral to the agency may generate an expedited response by a CSW (within two hours) or an immediate response by a CSW (before the end of a work shift) or a "five-day referral," meaning an in-person response must be made by the CSW within five days.

In October 2010, the juvenile dependency court sustained two counts pursuant to Welfare & Institutions Code section 300, subdivision (b) [failure to protect],[2] as follows:

> "b-1: . . . [M]other . . . and father . . . have a six year history of domestic violence and engaging in physical altercations in the presence of the children, including but not limited to the parents hitting and pushing each other. Such domestic violence by the parents endangers the children's health and safety, creates a detrimental home environment and places the children at risk.

> "b-3: On prior occasions . . . father . . . engaged in inappropriate behavior in that he mooned Joseph. Such inappropriate behavior by the father places the child and the child's sibling Luke, at risk of harm."

The court declared Joseph and Luke to be dependents of the court and ordered them to be suitably placed. The court ordered DCFS to provide family reunification services. There are no issues concerning jurisdiction in the current appeal. In February 2011, the court ordered the children to be returned to mother's custody and liberalized father's visits to unmonitored weekend overnight visits.

In March 2011, DCFS filed a non-detention report in support of a petition for subsequent relief (see § 342) after Joseph's therapist told the CSW of an incident described by Joseph in which father had become unreasonably angry for no apparent reason during an overnight visit. DCFS's section 342 petition alleged the incident involving Joseph and father as the basis for further relief, and requested new orders for monitored visits for father as to both children. In April 2011, the juvenile court dismissed the section 342 petition and ordered father and Joseph to engage in conjoint counseling and that, after four conjoint sessions, weekend overnight visits would resume. The court continued the order for overnight weekend visits for Luke.

---

**2**     All further section references are to the Welfare and Institutions Code unless otherwise noted.

In a status review report filed in April 2011, the CSW reported that mother and father were complying with their case plans, and that mother appropriately supervised and cared for the children with assistance from the maternal grandmother. Joseph and Luke were benefiting from family therapy. Father was requesting more extensive visits. In a supplemental report filed in May 2011, the CSW reported that she had observed weekend visits, and that Luke and father were comfortable together. Father stated that the visits with Luke were perfect. Mother stated that when Luke came home from weekend visits he would be angry, but would immediately give mother hugs and kisses and that relaxed him. In late May 2011, the juvenile court issued a "home of parents" order as to Luke; the court continued its "home of mother" order for Joseph.

In July 2011, DCFS filed an ex parte application for an order pursuant to section 385 after an immediate response referral was generated as to father. DCFS requested the juvenile court to vacate its then-existing order for ummonitored visits, and to issue an order for monitored day visits In an accompanying report, DCFS reported the CSW had gone to father's home to interview Joseph who was there with Luke for their regular visitation. Out of father's presence, Joseph said he wanted to go to mother's home because he did not feel safe at father's home. He said father called him names and hit him with fists in the stomach and arms. Joseph said that other children who had visited the home hit him too, and father would not make them stop. He said father also hit Luke in the stomach, and Luke would cry. According to Joseph father also put hot sauce in their mouths and made them hold it for five minutes. Father would call Joseph a "cry baby" and a "sissy," and father and the paternal grandparents would say bad things about mother. Father denied hitting the children or calling them names. As the CSW was about to leave, Joseph and Luke were crying and saying they wanted to go to mother's home. When the social worker told Joseph to call his mother if father hit them or called them names, Joseph responded that father would not let them use the phone to call mother. The CSW talked to the previous CSW who reported that father had physically attacked and threatened her. After the events at father's home, DCFS scheduled a team

4

decision meeting, but father did not attend. In late July 2011, the juvenile court set the issue for hearing, and ordered monitored visits for father in the interim.

In August 2011, DCFS filed an interim report stating that Joseph told the CSW that he did not want to go to conjoint counseling with father because he was afraid of father, and father kept calling him a liar. Joseph, then nine years old, said he wanted his visits with father "to be monitored" because he did not feel safe with father alone. Mother said she wanted the children to continue visits with father, but she believed father was "dangerous and unstable" and needed to "get help and learn[] how to be a good parent." Father did not provide any information; he failed to return the CSW's phone calls. In late August 2011, the juvenile court ordered monitored visits for Joseph and father in a therapeutic setting, and a two-week visit for father and Luke followed by visits on alternating weeks.

In mid-September 2011, DCFS filed an application for court authorization for removal of Luke from father before the up-coming week-long visit that was scheduled for later that month; the application was based upon mother's claim of sexual abuse of Luke by father. In an accompanying declaration, the CSW reported the following facts from mother: When Luke returned to mother's home after the two-week visit with father, Luke complained that his "bottom" hurt. When mother asked why he was having pain, Luke answered: "Daddy put his 'peepee' in my butt." Mother took Luke to the hospital where he was examined for possible sexual abuse. The CSW reviewed the medical reports. The reports indicated there was "some redness" around Luke's anus, and reddened peri-anal tissues. The "findings and interpretation" were an "abnormal genital exam" with a limited or insufficient history to make definitive findings, and that further "consultation /investigation" was needed. Luke's condition "may [have been] caused by sexual abuse or other mechanisms." On September 16, 2011, the juvenile court issued a removal order.

On September 21, 2011, DCFS filed a section 342 subsequent petition based on allegations of sexual abuse pursuant to sections 300, subdivisions (d) [sexual abuse of child] and (j) [sexual abuse endangering sibling]. On the same day, the juvenile court

5

removed Luke from father's custody, ordered monitored visits for both children in a neutral setting, and set the section 342 petition for a contested hearing.

In January and February 2012, DCFS submitted reports concerning its attempts facilitate conjoint counseling for father and Luke. In late February 2012, the juvenile court ordered DCFS to find a new therapist to provide conjoint counseling for father and Luke.

On March 27, 2012, following an extensive discussion with the lawyers for all parties, the juvenile court ordered that Joseph would be dismissed from the section 342 petition, and ordered DCFS's section 342 petition to be amended to allege a single count under section 300, subdivision (c) [child suffering serious emotional damage] as follows:

> "Minor, Luke [C.] suffers from significant, emotional problems and his father has a limited ability to deal with said problems. In particular, minor Luke has been diagnosed with post traumatic stress disorder and exhibits fear, and untoward aggressive behavior around his father and refuses to visit his father. Additionally, Luke has alleged that is father and other minor children have sexually abused him. Luke's emotional problems and father's limited ability to deal with said problems place Luke at risk of suffering severe anxiety, aggression, withdrawal and aggressive behavior toward himself and others."

The court sustained the section 342 petition's amended allegation under section 300, subdivision (c), concerning Luke's emotional problems, and then dismissed all of the allegations under section 300, subdivisions (d) and (j), concerning sexual abuse of Luke by father. The court ordered father's visits with Luke to be monitored, and for Luke and father to participate in conjoint counseling. In addition, the court appointed expert Michael Ward, Ph.D., pursuant to Evidence Code section 730 to examine father and Luke, and ordered that the psychological evaluations were to include input from Susan Wilson, Ph.D., and Carol Chambers, Ph.D., who already had involvement in the dependency proceedings.

On June 14, 2012, DCFS filed a section 388 petition to terminate contact between father and Luke until visits were deemed appropriate by Luke's therapist. The supporting information to the petition stated that, since May 8, 2012, DCFS had attempted five

6

monitored visits between father and Luke. Luke missed the first visit because he was sick; father failed to attend the next visit. The other three visits did not go well because Luke would say he was scared when he saw father, and then resisted any contact. Luke's therapist had recommended that he be "allowed to process his trauma in therapy" before having visits with father. Later in June, the juvenile court set the section 388 petition for hearing.

In July 2012, DCFS filed an interim review report in which it advised the court that the CSW had attempted to arrange conjoint counseling with more than half a dozen therapists without success, and that the CSW was continuing to search for a therapist who would provide conjoint counseling. Further, the report included facts showing difficulties in getting Luke to see father willingly during an arranged visit at a sheriff's facility in October 2011. The report also included information that the CSW had spoken with Luke's therapist, Dr. Wilson, in November 2011, who had questioned why DCFS would be recommending liberalized visits with father. Dr. Wilson told the CSW that she (the doctor) did not agree that visits with father were a good idea at that time. For his part, Father had told the CSW that since DCFS initiated therapy, it had to pay for it. The social worker accessed $720 of STOP funds for eight session of conjoint therapy. Father continued to blame DCFS for failing to set up visits, and would "not acknowledge" that visits had to be in a therapeutic setting. The CSW described a series of efforts to arrange visits that were mostly thwarted by father's failure to return phone calls or to agree to meet a designated times and places. Father failed to appear for one visit; Luke was sick on another occasion. Luke continued to resist seeing father.

On July 18, 2012, Dr. Ward, the court appointed expert (Evid. Code, § 730), filed his initial report. Luke stated that he did not want to see father anymore because father made him stand in the corner and he put his "pee pee" in the child's buttocks. It happened twice and it hurt. Joseph said father was mean and father did not care about them. Joseph gave an example of his getting hurt during a camping trip and of being attacked by a bully and father not caring. Joseph said father and mother used to get into fights and father would try to hit mother. Joseph told Dr. Ward about incidents when he

7

was on top of father and father made a "humping motion," and when father showed his buttocks. Joseph wanted to stop having contact with father, to not have to go to court anymore, to live with mother, and to have a happy life.

Dr. Ward interviewed the children's therapist (Dr. Wilson) and concluded that she was approaching therapy with Luke from the point of view that the alleged sexual abuse in fact happened, which was contrary to what the court found. Dr. Wilson stated that she had diagnosed Luke with Post Traumatic Stress Disorder, and Joseph with Anxiety Disorder. She did not believe Luke was ready to begin conjoint counseling with father, but agreed she could continue to treat Luke if the juvenile court ordered conjoint therapy. Dr. Wilson said Joseph was very afraid of father. She said Luke also reported and demonstrated behavior consistent with being afraid of father and not consistent with being coached. She believed Luke had been traumatized.

Dr. Ward did not interview mother; she provided a narrative of what had happened from her perspective. Father explained that Terry, Joseph, and Kevin were children of a couple from his church and that these boys sometimes would spend the night at his house. Father denied having any kind of homosexual interest or relationship with the boys or that there had been any form of sexual behavior between him and the boys or the boys and Luke. Father also denied the boys had ever been physically or verbally abusive to Luke. Father said mother had "coached" Joseph to turn against him and she had begun to "coach" Luke to turn against him as well. Father also provided a narrative of his perspective of what was going on in the family.

It was Dr. Ward's opinion that the alleged sexual abuse of Luke did not take place, that mother was the primary and fundamental problem in the case, that the juvenile court needed to retain jurisdiction until father had fairly frequent, extended, and unrestricted contact with the children, and then it needed to be transferred to the family law court.

On July 18, 2012, the juvenile court ordered DCFS to find a new therapist for Luke and to submit a report for the next hearing that addressed a visitation schedule for father and Luke. The court also ordered another report from Dr. Ward that provided more specific recommendations.

8

In September 2012, DCFS reported that Luke's new therapist would be Brad Wood, M.S.W., and an initial appointment with Luke was scheduled for early October 2012. Further, DCFS informed the juvenile court that financial assistance in the amount of $720 had been appropriated for conjoint counseling between Luke and father, but three different scheduled sessions had failed to take place. When father was informed that the financial assistance for the conjoint counseling was depleted, father said he was unable to pay for additional sessions and wanted DCFS to pay. When the CSW asked father if he would like to arrange visits with Luke at a park, father stated he did not foresee any visits taking place as long as Luke continued to reside with mother. Father preferred to wait to see what the court did. Mother was continuing to meet the needs of the children by providing food, shelter, clothing, and medical care. The children had no behavioral problems.

In a supplemental report, also filed in September 2012, Dr. (Michael) Ward stated that there had been virtually no contact between father and Luke for about a year because of Luke's demonstrated fear of father and the fact placing the child with father or starting extended visits were out of the question. Dr. Ward recommended an aggressive reintroduction of contact between the two supervised by a time-limited case therapist. Dr. Ward provided specific guidelines for recommended unmonitored visits, and for the therapist's participation. Dr. Ward added that in the event the professionals currently involved with Luke were unable or unwilling to go along with such a plan, they should be replaced by the court.

On October 11, 2012, the juvenile court terminated its jurisdiction over Joseph with a family law order granting mother sole legal and physical custody. Further, the court granted father monitored visits with the consent of Joseph and Joseph's therapist. These orders are not involved in the present appeal.

In late October 2012, DCFS reported that mother and father were in compliance with the case plan. Father's last visit with Luke was in June 2012. Since then, Luke had refused to have visits with father. DCFS recommended that Luke remain in mother's

custody, and that juvenile court jurisdiction over Luke be terminated with a family law order for monitored visits in a therapeutic setting for father and Luke.

On November 5, 2012, the juvenile court began a contested hearing regarding the disposition of DCFS's section 342 petition filed on September 21, 2012 [Luke suffers from emotional problems], DCFS's section 388 petition filed on June 14, 2012 [there should be no contact between Luke and father until approved by Luke's therapist], and whether jurisdiction over Luke should be terminated under section 364. On the first day of the hearing, mother's attorney called CSW Michelle Monette to testify. Monette had been assigned to monitor the visits between father and Luke; monitored four visits from May through June 2012. Father did not show for the third visit and did not cancel. The visits that father attended lasted about 15 minutes. During the visits, Luke was resistant to have contact with father, and father was unhappy because Luke did not want to visit. Luke would "always [cower] down on top of the play equipment in basically a fetal position." Periodically, Luke told Monette that he was afraid and wanted to go home. Monette tried to get Luke to interact with father, but Luke refused every attempt. Father made no effort to engage Luke during the attempted visits. Attempts to visit were stopped because father said he did not want anymore visits until after the next court date. Monette testified that she had no reason to believe mother had coached Luke to say he did not want to visit father.

On November 6, 2012, father's attorney called CSW Maria Gonzalez to testify. Gonzalez was the children's social worker on the case since mid July 2012. She arranged the conjoint visits that were to take place on August 21 and 28, and September 4, 2012. Gonzalez explained that the first visit did not take place because mother had changed cellular telephones without advising DCFS, and did not get the several messages that Gonzalez left her about the visit. Ultimately, Gonzalez went to mother's home and left a note on her door. The second visit did not go well because Luke would not stop crying and saying "no." He was very upset and his body was shaking. Gonzalez and the conjoint therapist tried to talk to and comfort him but every time mother would attempt to leave, he would start crying. The third visit did not take place because Luke ran and hid

10

when Gonzalez arrived at mother's home to transport him for the visit. He became very upset and kept saying he was not going. Again, Gonzalez tried to redirect Luke's attention and comfort him, to no avail.

During these failed attempts to facilitate visits, Gonzalez did not observe mother exerting any influence over Luke to get him to refuse to go to the visits. Later, when Gonzalez telephoned father and asked if he wanted to set up another visit, Father's response was, "What's the point?" Father was very upset that visits were not taking place and that they could not get Luke into their car. Gonzalez followed up with a letter to father letting him know that if he contacted the office they would arrange another visit. She also sent father a list of conjoint counseling referrals and asked him to choose one, but he never did. Gonzalez testified that mother chose not to take Luke to the new therapist. Gonzalez provided mother with referrals for still another new therapist, but the children were no longer on Medi-Cal, and DCFS could not refer them to a therapist without payment arrangements. Mother told Gonzalez that she was looking for one that would take her new insurance. More recently, mother told Gonzalez that the children were again on Medi-Cal; DCFS was planning to assist in finding a new therapist. At no time did Gonzalez have any concerns or reason to believe that mother was coaching Luke to refuse contact with father.

Father testified on November 7, 2012. Father believed mother coached Luke not to want to see father, and that Luke was fearful of father due to being coached. Father never witnessed any coaching by mother, but once heard her tell Luke that father was bad and saw her make inappropriate gestures and faces at father. Luke told father that mother told Luke to say father was mean. Father also accused maternal relatives and social workers Lucy Aguilar, Michelle Monette, and Tracey Sanchez of coaching Luke to be afraid of father. Father wanted Luke removed from mother's custody and placed in foster care so that the child could be de-programmed of all the coaching by mother and the maternal relatives. Father did not believe it was in Luke's best interest at that time to be placed with him, but hoped that after a period of time away from mother's influence, he could be.

11

After father's testimony, the juvenile court continued the trial to January 3, 2013, and ordered DCFS to file a report addressing visitation and Luke's new therapist.

In early January 2013, the CSW reported that she had been unable to contact father by phone to set up a visit and, therefore, sent him a certified letter informing him of a visit scheduled for December 11, 2012. On December 7, 2012, father advised the social worker that he had not received the certified letter and he would not be available for a visit on December 11, 2012, and he preferred that visits not take place at the DCFS office. The social worker suggested a park or a McDonald's restaurant, but father said those locations were "tainted." The social worker scheduled a visit to take place on December 18, 2012, at 5:00 p.m. at Grace Resource Family Visitation Center; father then asked that the visit take place at a McDonald's restaurant. The social worker arranged a visit for a McDonald's restaurant located on West Avenue L in Lancaster, and left father two voicemail messages advising him of the address. The social worker arrived for the visit at approximately 4:50 p.m. and waited about 30 minutes. At that time, Luke said he wanted to go home, so they left. Two days later, the social worker received a message from father stating he had waited at a different McDonald's restaurant. On a different topic, the CSW advised the juvenile court that she had provided referrals for a new therapist and that Luke was in the process of choosing one. DCFS again recommended that the court terminate jurisdiction over Luke with a family law order granting mother sole physical and legal custody and granting father monitored visitation in a therapeutic setting.

On January 3, 2013, the juvenile court resumed father's testimony. Father testified that during the two-week visit from August 27 to September 10, 2011, everything went well and there was no indication that Luke did not enjoy the visit. During the first two days of the visit, Luke said there were demons outside and exhibited aggressive behavior as if he was afraid and pretending to fight them. Father tried to reassure Luke by telling him there were no demons outside and he was safe in the house. As the visit progressed, Luke became calm, and became more affectionate and by the end of the visit the aggressive behavior subsided completely. That was the last time father

12

had an extended visit with Luke. After the visit, mother raised the sexual abuse claims. In a final summary, Father testified that he believed he had learned to be a better parent from the Parents Beyond Conflict program, and parenting classes, and individual counseling.

On January 7, 2013, the juvenile court ordered monitored visits between father with Luke once a week at Change of Faces, and for DCFS to investigate funding for a professional monitor. The court continued the trial to February 19, 2013.

In mid February 2013, DCFS reported that CSW Zina Hamilton telephoned father on January 11, 2013, and left two messages asking him to return the call to make arrangements for visits to take place at a McDonald's restaurant. On January 15, 2013, father made three telephone calls to Ms. Hamilton to inform her the court ordered the visits to take place at Change of Faces. CSW Gonzalez telephoned father and advised him that he would not be financially responsible for the monitor because Ms. Hamilton was a DCFS employee. Ms. Gonzalez telephoned father again on January 23 and February 5 and left messages regarding the monitored visits. Father did not return the calls. DCFS again recommended termination of reunification services and jurisdiction with a family law order granting mother sole legal and physical custody and father granted monitored visits in a therapeutic setting.

Mother testified on February 19, 2013. Mother said she had not coached Luke in any way to make negative statements about father, she never discussed any upcoming visit with him, and she never told Luke that a visit was scheduled. Mother also never observed the maternal great grandmother or Joseph talk to Luke about any of the visits with father. She recalled Joseph saying in Luke's presence that he did not like father. However, she had not heard Joseph tell Luke he should not visit father, that father was a loser, that father was not a good person, or that Luke should have nothing to do with father. Mother believed Luke's contact with father should be supervised. However, she believed the decision as to whether Luke had visits with father should be made by Luke. Although mother was aware the juvenile court did not sustain the allegation, still she believed Luke had been sodomized by father. She was not sure she wanted the

13

dependency case closed because she liked having the social worker monitoring what was happening.

CSW Laua Seeman testified she monitored a visit between father and Luke on September 22, 2010. After the visit had ended, she was told by two employees that father was waiting for her at her car in the parking lot. This frightened Seeman and she felt like father was stalking her. She was also frightened of father because he had always been very aggressive with her. CSW Maria Gonzalez testified that her recommendation was for monitored visits between father and Luke, and termination of jurisdiction with Luke remaining placed with mother.

On March 13, 2013, the juvenile court dismissed DCFS's section 388 petition (filed June 14, 2012) concerning visits between father and Luke as moot. The court then heard argument with respect to disposition on the section 342 petition (filed September 21, 2011 and amended and sustained March 27, 2012) concerning Luke's emotional problems, and the section 364 issues. DCFS argued there was no evidence of any risk to Luke in mother's custody, argued there was no longer any need or purpose for continued juvenile court jurisdiction, and asked the court to terminate dependency jurisdiction with a family law order giving mother full legal and physical custody and granting father monitored visits in a therapeutic setting. Mother's attorney joined with DCFS. Luke's attorney and father's attorney asked the court remove Luke from mother's custody.

After stating its view that "conditions continue to exist [for jurisdiction], perhaps," the court found it would not be in Luke's best interest to be removed from mother's custody, the parents had complied with the case plan, there were no other orders the court could make, and there would be no benefit to Luke to continue supervision. The court awarded mother sole legal and physical custody and father prescribed visits.

## DISCUSSION

*Father's Appeal*

I.      **Dispositional Orders**

Father contends the juvenile court's dispositional orders removing Luke from the custody of father and "maintaining" Luke in mother's home must be reversed because the

14

orders are not supported by substantial evidence. According to father, the record contains "overwhelming evidence" showing that mother caused the alienation between Luke and father, as well as the past and ongoing emotional distress suffered by Luke. Father does not dispute that the evidence shows Luke suffers from significant emotional problems, including fear and aggressive behavior toward father, and a refusal to have contact with father. Nor does father dispute that the evidence shows he has limited ability to deal with Luke's problems. The prime contention by father on appeal is that the evidence does not support the remedy that the juvenile court utilized to address Luke's problems, namely, leaving him in the circumstances that are causing those problems. We disagree.

An examination of father's arguments on appeal must take into consideration the framework for the juvenile court's orders of March 13, 2013 from which both father and Luke have appealed, as well as the standard of review on appeal. The protracted court proceedings that culminated in the lower court's orders in March 2013 arose from (1) DCFS's section 388 petition filed in June 2012 seeking to terminate contact between father and Luke until visits were deemed appropriate by Luke's therapist; and (2) DCFS's section 342 petition filed in September 2011/March 2012 that alleged Luke suffered emotional problems, to wit, a fear of father. Mother was a so-called "non-offending parent"[3] vis-à-vis both of the petitions. In other words, neither petition put mother, or DCFS, on notice that Luke might be subject to removal from her custody. Furthermore, neither father nor Luke filed a section 388 petition or any other application or request that placed mother on notice that the issue of removing Luke from her custody would be litigated. While it is true that the issue of removing Luke from mother's home was addressed during testimony and argument at trial, and while it is true that the juvenile court made a finding that removal would not be in the best interests of Luke, the issue of removing Luke from mother's custody was not truly an issue for the juvenile court at the time it rendered its March 2013 orders.

---

**3** The term "non-offending parent" is not generally used in the dependency statutes. It is used more as a shorthand description of a parent who is not alleged to be responsible for any wrongdoing directed toward a child.

Father's arguments on appeal do not persuade us that the procedural due process requirement of filing an appropriate petition, thereby providing proper notice to mother, and to DCFS, may be avoided in the current proceedings. Father's argument on appeal that due process notice concerns were satisfied because "everyone knew" the issue of removing Luke from mother was being tried is not persuasive. First, this is not a wholly accurate portrayal of the trial proceedings in late 2012 into early 2012, particularly in light of petitions at issue. The issue of removal was raised by father as a component of his response to the petitions which sought relief as to him. We agree with DCFS's position on appeal that if the juvenile court had removed Luke from mother, then she, as well as DCFS, would have had a strong argument for a due process structural error in the proceedings.

Father relies on *In re Christopher C.* (2010) 182 Cal.App.4th 73 (*Christopher C.*) for the proposition that the juvenile court may remove a child from a parent where the ongoing conflict between the parents is so severe it is causing the child to suffer serious emotional distress. (*Id*. at pp. 81-82.) *Christopher C.*, however is not instructive on the due process issue. In *Christopher C.*, the issue of removal from the father was raised by a section 300 petition alleging physical abuse by the mother and sexual abuse by the father. (*Id*. at p. 78.) Without objection by any party, the juvenile court amended the petition at the adjudication hearing by adding the following allegation pursuant to section 300, subdivisions (b) and (c). " 'There exists a severe dysfunction within this family resulting in an ongoing & severe family law conflict, resulting in cross allegations of sexual abuse, physical abuse, [and] "coaching" and there also exists evidence of the failure of the mother and father to properly supervise the children, all of which places the children at risk of serious physical and emotional harm.' " (*Id*. at p. 81.) Thus, in *Christopher C.* a petition was at issue, albeit of short notice (without objection), concerning removal of the child from both parents, not merely the one parent initially put on notice by the original form of the petition.

Here, the section 342 petition was amended, with father's approval, to allege Luke suffered emotional problems, but there was never any pleading, by amendment or otherwise, to put the issue of removal from mother at issue. *Christopher C.* is unhelpful here because the juvenile court was never presented with a petition alleging dysfunction or other ongoing and severe family conflict justifying removal from mother. Neither DCFS, nor father, nor Luke ever filed a section 388 petition alleging grounds for removal from mother. Perhaps more importantly, no such allegations were ever found true by the juvenile court. There simply was no foundational, procedural basis upon which an order for Luke's removal from mother could be based, any order removing Luke from mother would have suffered from a fatal jurisdictional defect. (See *In re B. G.* (1974) 11 Cal.3d 679, 688 [because parental interest in a child is a compelling one, a parent must be given notice and an opportunity to be heard].) Raising the issue by way of father's testimony and argument from counsel at the time of hearing does not satisfy due process requirements. The juvenile court had no authority to remove Luke from mother's custody on March 13, 2013. Accordingly, its decision not to do so, regardless of its stated reasons, cannot be considered error.

In summary, while we agree with father that the juvenile court must make orders regarding where a child will live when it addresses dispositional issues on a supplemental section 342 petition (see generally, *In re N.M.* (2011) 197 Cal.App.4th 159, 160; *In re Joel T.* (1999) 70 Cal.App.4th 263, 267-268), including orders as to whether to remove a child from parental custody (*In re Joel T., supra*, at pp. 267-268), this does not further mean that a child may be removed from a parent, here, mother, when no existing allegations are at issue concerning removal of the child from the parent.

Finally, apart from the due process barriers to reversal on appeal, we will not reverse the dependency court's dispositional "placement" orders in any event because the orders are supported by substantial evidence. In examining a record on appeal, we do not search the record for evidence which would support a different result than that reached by a lower court, but rather, we look for evidence which supports the result actually reached by the lower court. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319; *In re Daniel C.H.*

17

(1990) 220 Cal.App.3d 814, 839.) While father is correct that there is some evidence in the record, in the form of the expert therapists appointed by the lower court, to support an order removing Luke from mother, that showing will not support reversal because it is the juvenile court that ruled against father and there is evidence supporting the juvenile court's decision to maintain Luke in mother's custody. The evidence that supports the juvenile court's orders includes the following. DCFS's regularly reported that mother properly provided care for the children. Mother denied coaching the children to be fearful of father, and, by our count, at least three social worker reported (and at least two testified) that they had never observed mother coach Luke, and that they had no reason to believe coaching was occurring. As for father's claims of coaching, his testimony showed he had no more than a belief that mother was engaging in such activity. Father conceded he could not provide proper care for Luke. Because there is evidence in support of the juvenile court's decision to place Luke with mother, we will not reverse.

## II.     Termination of Jurisdiction

Father contends the order terminating the juvenile court's jurisdiction over Luke must be reversed because it is not supported by substantial evidence. More specifically, father contends the evidence "unequivocally established" there is a need for continuing supervision of the family by the juvenile court. We not persuaded by father's arguments that reversal is required.

In addressing DCFS's motion to terminate jurisdiction pursuant to section 364, the juvenile court made the following comments:

"Conditions continue to exist, perhaps?   I can't fix this. I can't keep this child before the court.  I can't keep doing this to the child to have petition after petition filed. It is not in the child's best interests."[4]

---

[4]     At earlier hearing dates on the petitions, the court stated that it was "extremely frustrated" that every order it had made for visitation had been thwarted in some fashion and it did not have a "magic wand to waive over this case."

Seeing no benefit to continuing the case, the court terminated its jurisdiction over Luke, awarded mother full legal and physical custody of Luke, and ordered father to have monitored, therapeutic visits. Father argues the juvenile court essentially decided to throw up its hands in defeat, and that such an abdication cannot be reconciled with the purpose of dependency law, which is to protect the best interests of dependent children. We disagree. Although the record shows frustration by the juvenile court, we find the record supports the court's conclusion that its continued jurisdiction was not in Luke's best interests.

The juvenile court must review the status of a dependent child every six months (§§ 364, 366.21, 366.22; *Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 303-304 (*Bridget A.*).) When, as here, a child is in the custody of a parent, the court must determine at each six month interval whether the dependency court's jurisdiction should be terminated or whether further supervision is necessary. (§ 364; *In re N. S.* (2002) 97 Cal.App.4th 167, 171-172; *In re Joel T., supra,* 70 Cal.App.4th at pp. 267-268.) Further supervision is deemed necessary if conditions still exist that would justify the court taking jurisdiction of the child or such conditions would exist if jurisdiction were terminated. (§ 364, subd. (c); and see also *In re N. S., supra,* 97 Cal.App.4th at p. 173.) In reviewing a decision to terminate dependency jurisdiction, a reviewing court applies an abuse of discretion and substantial evidence standard. (*Bridget A., supra,* 148 Cal.App.4th at pp. 300-301, citing *In re Stephanie M., supra*, 7 Cal.4th at p. 318; and see also *In re N. S., supra,* 97 Cal.App.4th at p. 172.)

Father recognizes that there are multiple cases which support the proposition that custody battles generally should be addressed in family law courts, not in our dependency courts. As the Court of Appeal observed in *In re John W.* (1996) 41 Cal.App.4th 961 (*John W.*): "When molestation allegations are made in a divorce context, social service agencies obviously find themselves in a bind. Obviously one of the core functions of the juvenile dependency statutes is to protect child from molestation. Social services agencies do not have the option of ignoring such cases, even when they arise out of . . . the suspicious circumstances of a divorce. . . . But the very gravity of the

19

allegations underscores the necessity of obtaining findings on the molestation allegations as expeditiously as possible, rather than leaving the matter unresolved. And if it turns out that the allegations are unsubstantiated and appear to be the product of an attempt by one parent to get the upper hand in a custody fight, county counsel should not hesitate to seek dismissal of the [dependency] case. They have more than enough real cases to keep them busy." (*Id*. at p. 976, fn. 22.)

Despite these well-established judicial acknowledgments, father argues that the dependency proceedings concerning Luke involve more than merely unfounded and unsubstantiated allegations by mother that father had sexually abused Luke. Father argues that the problem is this case is that mother has continued a campaign against father despite the juvenile court's dismissal of all of the sexual abuse allegations in the proceedings, and, in so doing, has inflicted serious emotional abuse on Luke. Father argues that the circumstances bring the present juvenile court proceedings concerning Luke into the realm of *Christopher C*., *supra*, 182 Cal.App.4th 73, and justify continued juvenile court jurisdiction.

We understand but reject father's argument. The issue is largely a matter of the degree of the juvenile court's discretion when it decides whether to continue or terminate its jurisdiction over a dependent child. We agree with father that *Christopher C*. supports the proposition that the dependency court may properly exercise jurisdiction over a child when a divorce and custody battle between parents evolves to the point where acts by one or both parents are causing a child to suffer serious emotional harm. (See *Christopher C., supra*, 182 Cal.App.4th at pp. 73, 84-85.) In short, "when, . . . children are at substantial risk of emotional harm as a result of being utilized as weapons in an ongoing familial fight, the dependency court properly exercises jurisdiction and declares them dependent children." (*Id*. at p. 86.) We reject father's argument here because we are not convinced that the record in the current case discloses evidence which shows, as a matter of law, an environment rising to the level of a *Christopher C*. situation, mandating continued juvenile court jurisdiction.

20

Undoubtedly, Luke suffers from emotional problems. There is evidence showing mother might be causing such damage; there is evidence against such causation. Had the lower court retained jurisdiction, would an abuse of discretion be established? Likely not. But the obverse is not necessarily true either. We find it was not an abuse of discretion to terminate jurisdiction. The court acknowledged that the conditions justifying jurisdiction "perhaps" still existed, but concluded that further supervision of the family by DCFS and the court would not be in Luke's best interests. We cannot say that the court's conclusion was not supported by evidence or an abuse of discretion because it was unreasonable. " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge. The reviewing court should interfere only " 'if [it] find[s] that under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he did.' . . ." ' [Citations.]" (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) In our view, a reasonable judge could have, and did, decide that termination was in Luke's best interests.

*Minor's Appeal*

## I.   "Placement" with Mother

Luke contends the dispositional order "placing [him] with mother"[5] must be reversed because "substantial evidence supported [his] removal from mother's custody." His contention implicitly rests on the foundation that the juvenile court's orders of March 13, 2013 included a dispositional order "placing" him with mother. In a related vein, he argues that clear and convincing evidence demonstrated parental inability of mother to provide proper care within the meaning of section 361. Overall, he claims that mother's actions "sabotaged" his relationship with father, that he has suffered severe emotional harm in mother's custody, and that there is a risk of future harm if he remains with her. For the reasons stated above in addressing father's appeal, Luke's argument does not persuade us to find error in the juvenile court's orders of March 13, 2013.

---

[5]   Luke's appeal is slightly different from father in that the latter spoke in terms of order "maintaining" Luke in mother's custody and home.

First there was no dispositional order in March 2013 "placing" Luke with mother; the court long before placed Luke with mother, long before the petitions which were at issue were even filed. Although it is true that a court must make jurisdictional and dispositional orders when a supplemental section 342 petition is filed, those orders must be framed by the matters which are placed at issue by the petition. Placing Luke with mother was not an issue here. In March 2013, the court declined to remove Luke from mother's custody.

To the extent Luke implicitly contends that a decline-to-remove order may be viewed as the functional equivalent as a first-instance placement order, we find the court's order here is not subject to reversal for the reasons stated above in addressing father's appeal. First, not placing, or removing, Luke from mother was not an issue for the juvenile court — under the petitions being addressed — at the time of the court's March 2013 orders. In other words, whether this case were an original section 300 context or a section 3423 context, the juvenile court could not have not placed, that is, removed, Luke from mother without a foundation in some petition showing ground for not placing or removing him from mother's home. Second, we find the order "placing" Luke in mother's home is supported by substantial evidence. The issue is not whether evidence would support a different result, but whether the evidence supports the orders made. It does.

## II.    Termination of Juvenile Court Jurisdiction

Luke contends the juvenile court's order terminating its jurisdiction over Luke must be reversed because it is not supported by substantial evidence. We disagree.

Termination of juvenile court jurisdiction over a dependent child is governed by section 364. Subdivision (c) of section 364 provides: "After hearing any evidence presented by the social worker, the parent, . . . or the child, the court shall determine whether continued supervision is necessary. The court shall terminate its jurisdiction unless the social worker establishes by a preponderance of the evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or those conditions are likely to exist if supervision is withdrawn. . . ."

Luke argues the evidence showed that the conditions which caused the juvenile court to take jurisdiction still existed or would exist if its jurisdiction were terminated. Luke's argument looks at the evidence from the wrong perspective. The issue on appeal is not whether the evidence would support a different juvenile court decision on the issue of whether "continued jurisdiction is necessary," but whether there is substantial evidence in the record supporting the decision actually made by the juvenile court. (See *In re N. S., supra*, 97 Cal.App.4th at p. 172; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)

Here, the danger that required juvenile court jurisdiction was domestic violence between the parents and father's inappropriate practice of exposing his buttocks to the children. These were the jurisdictional findings under the original section 300 petition. Under the supplemental section 342 petition, the court rejected the allegation that Luke was not at risk of being sexually abused by father; the danger that required jurisdiction under the section 342 petition was Luke's serious emotional problems, including fear of father.

The evidence — as it concerns the issue of termination of dependency jurisdiction, and as reviewed under the appropriate standard of appellate review — showed that Luke suffered emotional distress and exhibited fear when father was present, but he otherwise appears to be a well-adjusted child with no serious behavioral problems. Basically all of the social workers saw no basis for concerns as to mother. Mother denied coaching Luke to fear father. There is no dispute that mother provides appropriate care – shelter, food, clothing, schooling and medical needs. As Division One of our court noted in *In re A.G.* (2013) 220 Cal.App.4th 675, dependency jurisdiction is not preferred where one of two parents is able to properly care for the children. (*Id*. at pp. 683-686.) And as noted in *John W.,* the juvenile court must look to the best interest of the child in making exit orders. (*John W., supra*, 41 Cal.App.4th at pp. 973-974.) In so doing, the court may terminate its supervision of a dependent child and limit one parent's visitations rights to minimize or eliminate the danger to which visits might subject the minor. (*In re Chantal S*. (1996 13 Cal.4th 196, 204.) Father acknowledges that Luke should not be placed with father at this time. Plainly, mother and father cannot co-parent. Because Luke was

23

frightened of father and refused to visit, a reasonable viable option was to place Luke with mother and grant monitored visits to father in a therapeutic setting and terminate the dependency court's jurisdiction.

## III. Joinder

Pursuant to California Rules of Court, rule 8.200(a)(5), Luke and father have joined each other's arguments on appeal. As we have rejected their placement and jurisdiction issues, we find no ground for reversal as to those claims joined by Luke and father, and vice versa.

## DISPOSITION

The dependency court's orders are affirmed.

BIGELOW, P. J.

We concur:

FLIER, J.

GRIMES, J.